# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| Jason O. and Jill O., individually and as next friends of Jacob O., a minor, |  |
| Plaintiffs, | Case No. 14 C 7778 |
| v. | Judge John Robert Blakey |
| Manhattan School District No. 114 and Illinois State Board of Education, |  |
| Defendants. |  |

## MEMORANDUM OPINION AND ORDER

This is an administrative review action brought by Plaintiffs, the parents of Jacob, a seven-year-old child with behavioral problems, under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1491. Plaintiffs argue that Defendants Manhattan School District No. 114 and the Illinois State Board of Education (together, "Defendants" or the "School District") failed to provide Jacob with appropriate educational placements under the statute. There was a six-day administrative hearing in August and September 2014, and, in a 38-page decision dated September 22, 2014, the hearing officer found for the School District on every issue but one.

Plaintiffs now challenge all of the hearing officer's decisions, and the parties cross-move for summary judgment [51] [55]. This Court, giving the requisite deference to the hearing officer's decision, and having independently reviewed the

Administrative Record, grants in part, and denies in part, each motion for summary judgment, and finds as follows:

## I.  Legal Standard

Enacted by Congress in 1975, the IDEA entitles all children with disabilities to access to public education, and mandates that every school district receiving federal funding must provide such children with a free appropriate public education ("FAPE"), 20 U.S.C. § 1412(1), together, to the maximum extent appropriate, with nondisabled children ("least restrictive environment" or "LRE").  20 U.S.C. § 1412(5).  In order to map out an IDEA-compliant education for each child, the statute draws parents together with school professionals, and any relevant experts (retained by the parents, the school district, or both), to draft an individualized education program ("IEP").  20 U.S.C. § 1414(d).  Generally, an IEP is valid under the statute when: (1) the school district adheres to the IDEA's procedures; and (2) the IEP is "reasonably calculated to enable the child to receive educational benefits" by responding to "all significant facets of the student's disability both academic and behavioral."  *Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176, 206-07 (1982); *Alex R. v. Forrestville Valley Community Unit School District No. 221*, 375 F.3d 603, 611-15 (7th Cir. 2004).  The "reasonably calculated" standard means "likely to produce progress, not regression or trivial educational advancement," and the "requisite degree" of such progress varies depending upon the student's abilities.  *Alex R.*, 375 F.3d at 615. When a dispute arises under the IDEA mandate, the parties may seek

administrative review under the statute, 20 U.S.C. § 1415(f), known as a "due process" hearing, which in turn may be appealed to this Court.

The standard of review in cases brought to this Court under the IDEA differs from that governing the typical review of summary judgment. *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997). The IDEA provides that in reviewing the outcome of a due process hearing, this Court shall: (1) receive the Administrative Record; (2) hear additional evidence as requested; and (3) basing its decision upon the preponderance of the evidence, grant such relief as this Court determines is appropriate. 20 U.S.C. § 1415(i)(2)(c). The party challenging the outcome of the administrative proceedings (here, Plaintiffs) bears the burden of proof. *Alex R.*, 375 F.3d at 611-12. On issues of law, the hearing officer is not entitled to any deference at all. *Id.* On issues of fact, this Court accords the hearing officer's decision "due weight"—a flexible standard that "varies from case to case." *Id.*

The "due weight" that this Court must give to the hearing below, however, is not to the testimony of witnesses or to the evidence itself (both of which this Court must independently evaluate), but rather to the resulting decision of the hearing officer. *Heather S.*, 125 F.3d at 1053. Thus, because educational professionals and other members of the IEP team are generally better suited than are federal judges to determine educational policy for each child, this Court is required, in its independent evaluation of the evidence, to give due deference to the results of the administrative proceedings. *Beth B. v. Van Clay*, 282 F.3d 493, 496 (7th Cir. 2002).

The degree of deference depends on the amount of new evidence relied upon by the reviewing court. *See Alex R.*, 375 F.3d at 612. When this Court does not consider any new evidence and relies solely on the Administrative Record, it owes considerable deference to the hearing officer, but may still set aside the hearing officer's decision if "strongly convinced" that the decision is erroneous. *Id.* This level of review is akin to the clear error or substantial evidence standard. *Id.* If, however, this Court considers evidence that is not part of the Administrative Record, its level of deference to the hearing officer decreases. *Id.* In such circumstances, even though the Administrative Record is still part of the case, it is entitled to less weight or deference. *Id.*

Here, although Plaintiffs have supplemented the Administrative Record on certain issues (*e.g.*, [51-3], [88] and [114]), this Court has relied almost exclusively upon on the Administrative Record itself, rather than such supplemental materials. Accordingly, under the "due weight" standard, this Court has given considerable deference to the hearing officer's decision.

## II. Facts[1]

Jacob resides with his parents (Plaintiffs) in the school district encompassed by Manhattan School District No. 114. DSOF ¶ 1; PSOF ¶ 1. Jacob has been diagnosed with Disruptive Mood Dysregulation Disorder and Attention Deficit Hyperactivity Disorder. DSOF ¶ 6(a) and (b). The result of these impairments is

---

[1] For the most part, the facts are taken from the parties' Local Rule 56.1 statements and the Administrative Record ("AR"). "DSOF" refers to Defendants' statement of undisputed facts [56], with Plaintiffs' responses [66]. "DSOAF" refers to Defendants' statement of additional facts [61] to which Plaintiffs did not respond. "PSOF" refers to Plaintiff's statement of undisputed facts [51-1], with Defendants' responses [61].

that Jacob has trouble with self-management, behavior regulation and social skills. DSOF ¶ 6(c). As a result, Jacob requires, and has received, an IEP under the IDEA. *See* 20 U.S.C. § 1414(d).

In reciting the case background, this Court first sets out Jacob's relevant educational history, from preschool to first grade (Subsection A); and then summarizes the procedural history underlying this administrative review action (Subsection B).

### A. Educational History

#### 1. 2011 to 2012 School Year (Preschool)

The relevant background begins during the 2011 to 2012 school year, when Jacob was four-years-old and attending preschool. DSOF ¶ 14; PSOF ¶ 2. Plaintiffs placed Jacob at the private preschool Kid Country Childcare ("Kid Country"). DSOF ¶ 14. While attending Kid Country, Jacob underwent a preschool screening to determine his eligibility for speech therapy due to articulation errors. PSOF ¶ 3. Jacob was referred to the local school district, namely, Manhattan School District No. 114. PSOF ¶¶ 3-4.

The School District held an October 27, 2011 meeting with Plaintiffs to devise an IEP for Jacob, as required by the IDEA. DSOF ¶ 14; PSOF ¶ 6. The team, that is, Plaintiffs and the School District, classified Jacob with a "Speech or Language Impairment" and determined that Jacob was eligible to receive speech and language services to address his impairment. AR 4394, 4401; DSOF ¶ 14; PSOF ¶ 6. So beginning November 4, 2011, Jacob, as reflected by the October 2011 IEP

Conference Report, started seeing the District's speech therapist, Cathy Muckian, for half-hour weekly sessions at Wilson Creek Elementary School ("Wilson Creek") while also attending Kid Country. AR 4399; DSOF ¶¶ 14-15; *see also* PSOF ¶ 6. No transportation between the two schools was provided: the October 2011 IEP Conference Report includes a field for "Transportation," and the option "Student does not require transportation" was checked. AR 2603 (cited at PSOF ¶ 9).

Although the School District found Jacob eligible to receive speech and language services, Plaintiffs also wanted Jacob to be tested for certain other disabilities during the 2011 to 2012 school year. DSOF ¶ 20. Plaintiffs were concerned about Jacob's emotional functioning and his interactions with peers. DSOF ¶ 20.

Here, the administrative hearing officer found a factual dispute as to exactly when Plaintiffs first made a request for further testing to the School District. AR 0019-20. It is not disputed, however, that Plaintiffs at least made a formal written request on March 29, 2012, through a letter from Jacob's mother to the Principal of Wilson Creek, Barbara Hogan. DSOF ¶ 20 (citing AR 4215). Either attached to the same letter or at another time (and the Administrative Record is not exact here, *see* AR 0019-20), Jacob's mother also forwarded to Principal Hogan a December 14, 2011 memo from the Director of Kid Country, Donna Phelan, that recorded Kid Country's observations and recommendations for Jacob's educational care. DSOF ¶ 22; PSOF ¶ 17. Director Phelan explained that, according to Jacob's teachers at Kid Country, Jacob had anger issues that required constant monitoring, and Director

Phelan recommended that Jacob see a social worker before transitioning to public school for kindergarten. AR 4213-14 (cited at DSOF ¶ 22). Jacob's mother testified that she also sent the December 14, 2011 memo to Principal Hogan months earlier, in December 2011. PSOF ¶¶ 12-14. Principal Hogan did not recall exactly when she received the letter, but, at the very least, she was aware of the parents' unwritten concerns about Jacob's behavior prior to March 2012. DSOAF ¶ 5 (citing 8/26/14 Hearing Tr. at 228-29).

Also in December 2011, Plaintiffs began sending Jacob to BDI Playhouse Children's Therapy ("BDI Playhouse"), a private company, for occupational therapy services to address Plaintiffs' concerns about Jacob's motor skills and behavior. DSOF ¶ 23; PSOF ¶ 15. According to the Administrative Record, Jacob ultimately attended 14 sessions at BDI Playhouse from 2011 to 2013. *See* AR 3651.

In response to the March 29, 2012 letter, and before an April 27, 2011 meeting, Principal Hogan: (1) met with Jacob's speech therapist (Muckian) two or three times to discuss Muckian's observations of Jacob's behavior during their sessions together; (2) spoke with Director Phelan; and (3) reviewed the paperwork from Jacob's October 7, 2011 preschool screening and March 30, 2012 kindergarten screening. AR 2614 (cited at DSOF ¶ 21); 8/26/14 Hearing Tr. at 227-31; DSOF ¶ 24; DSOAF ¶ 8; PSOF ¶ 18. Ostensibly, neither of the school's screening sessions revealed any behavior issues. 8/26/14 Hearing Tr. at 230-31.

On April 27, 2011, the School District convened a meeting with Plaintiffs to review their request for an evaluation. DSOF ¶ 21; PSOF ¶ 19. The School District

determined, over Plaintiffs' objection, that a full case study was unnecessary at that time. AR 2612; DSOF ¶¶ 21, 24; PSOF ¶ 20. Discounting the observations and concerns of Plaintiffs (and those of Jacob's teachers at Kid Country), Principal Hogan, in the formal denial of evaluation letter dated April 27, 2011, stated that no behavior concerns were found in either Jacob's preschool or kindergarten screenings, and that the speech therapist (Muckian) had not observed any behavior issues. AR 2614 (cited at DSOF ¶ 21); 8/26/14 Hearing Tr. at 230-31. The Conference Notes from the meeting show that the School District intended to implement a Behavioral Intervention Plan without any formal evaluation, and later provide Jacob with social work and occupational therapy services when he joined kindergarten in August 2012. DSOF ¶ 24(a).

Soon thereafter, at Plaintiffs' request, the School District and Plaintiffs met again on May 3, 2012 to revise Jacob's IEP. DSOF ¶ 25; PSOF ¶ 22. As before, Jacob was classified with a "Speech or Language Impairment." PSOF ¶ 25. The team agreed that Jacob would be placed in the Early Childhood special education classroom at Wilson Creek for a trial period from May 7 to 29, 2012. AR 2621; DSOF ¶ 25; PSOF ¶ 23. This IEP, unlike the one before, also provided Jacob with transportation between Kid Country and Wilson Creek. PSOF ¶ 24 (citing the "Transportation Plan," AR 2623-24).

Jacob did, in fact, attend the Early Childhood program during the trial period. AR 2634-36 (cited at DSOF ¶ 26). Karen Wingfield taught this class. DSOAF ¶ 10.

The 2011 to 2012 school year ended with Plaintiffs and the School District agreeing, on May 31, 2012, that the team next would revisit Jacob's IEP closer to the start of the 2012 to 2013 school year. DSOF ¶ 27.

### 2. 2012 to 2013 School Year (Kindergarten)

During summer 2012, prior to the start of the next school year, Plaintiffs received two evaluations about Jacob. DSOF ¶¶ 28-29; PSOF ¶¶ 31-33. On June 26, 2012, Plaintiffs obtained a private auditory processing evaluation from audiologist Dr. Jeanane Ferre, and she issued a report on June 30, 2012. AR 2641-47; DSOF ¶ 28; PSOF ¶ 32. Dr. Ferre did not find that Jacob had any auditory disability. DSOF ¶ 28. Jacob also saw psychologist Dr. April Carbone over three days in May 2012 for a neurodevelopmental evaluation, and Dr. Carbone issued a report on July 3, 2012. AR 2648-56; DSOF ¶ 29; PSOF ¶ 33. Dr. Carbone made a provisional diagnosis that Jacob had Attention Deficit Hyperactivity Disorder and Disruptive Behavior Disorder. AR 2651-52; DSOF ¶ 29; PSOF ¶ 33.

As promised on May 31, 2012, Plaintiffs and the School District reconvened on August 2, 2012 to develop Jacob's IEP before the start of the 2012 to 2013 school year. DSOF ¶ 31; PSOF ¶ 34. The team considered and relied upon the summer 2012 evaluations from Dr. Carbone and Dr. Ferre, among other information, and classified Jacob with two disabilities: "Development Delay" (primary classification) and "Other Health Impairment" (secondary classification). DSOF ¶ 31; PSOF ¶ 34. The team decided to place Jacob in the Early Childhood special education classroom for the full school year, concluding that the classroom would support Jacob's social-

emotional, behavioral and speech needs. AR 2680; DSOF ¶¶ 32, 35; PSOF ¶ 35. The team agreed to meet again in four to six weeks. PSOF ¶ 36.

Generally, Jacob had a successful school year in the Early Childhood classroom despite some behavioral issues at the outset. DSOF ¶ 34. When Plaintiffs and the School District convened again on October 11, 2012 (slightly longer than four to six weeks) to revisit Jacob's IEP, the School District reported overall satisfactory progress with Jacob's speech development and behavior. PSOF ¶ 38.

Plaintiffs and the School District next met near the end of the school year, on April 18, 2013, to devise Jacob's IEP for the 2013 to 2014 school year. DSOF ¶ 36; PSOF ¶ 39. The team agreed that Jacob would repeat kindergarten, but would be moved from the Early Childhood classroom to the general education classroom, where Jacob would have additional supports in place. AR 2724-25; DSOF ¶ 36(b) and (d). The team also agreed to assess Jacob's IEP next during the first quarter of the 2013 to 2014 school year. DSOF ¶ 36(e).

### 3. 2013 to 2014 School Year (Kindergarten Repeated)

The 2013 to 2014 school year, unlike the year before, was challenging for Jacob, as it was marred with behavioral struggles from the start. 8/29/14 Hearing Tr. at 72; DSOF ¶¶ 37, 45(b), 53, 57, 59. For example, the Administrative Record contains an email chain describing two September 2013 incidents where Jacob kicked and hit his peers. AR 3335-39 (cited at DSOF ¶ 37). There also was testimony from the school psychologist reporting a "great deal of non-compliance,"

including verbal and physical aggression by Jacob, early in the school year. 8/29/14 Hearing Tr. at 141-42 (cited at DSOF ¶ 37).

These behavioral problems led to the School District holding an October 1, 2013 meeting with Plaintiffs to chart a way forward. DSOF ¶ 45; PSOF ¶ 43. As recorded in the Conference Notes from the meeting, Jacob's kindergarten teacher, Wingfield (who previously taught Jacob), reported on Jacob's behavioral problems, including "several instances of physical aggression." AR 2744. Wingfield added that Jacob's behavior was "interfering with his overall educational functioning." AR 2744; *see also* DSOF ¶ 45(a). The team agreed to conduct a functional analysis to determine if certain triggers precipitated Jacob's aggressive outbursts. DSOF ¶ 45(c).

Also during the October 1, 2013 meeting, the School District recommended that Jacob be placed in developmental kindergarten, which had a smaller class size and more supervision than the general classroom. DSOF ¶ 45(d) to (e). As part of the IEP team, Plaintiffs rejected that placement option, however, so it was not adopted. DSOF ¶ 45(f) to (g). The team instead agreed to increase Jacob's classroom supports, doubling Jacob's "social work time" to 60 minutes per week and providing Jacob with a personal aide. 8/27/14 Hearing Tr. at 107-09; DSOF ¶ 45(g); PSOF ¶ 43. Those agreements were memorialized in a formal amendment to Jacob's then-effective April 2013 IEP. PSOF ¶ 45 (citing the "Parent / Guardian Notification of Individualized Education Program Amendment," AR 2750).

Jacob's behavioral struggles, however, continued despite the October 1, 2013 changes. By way of example, on October 22, 2013, Jacob hit and pushed his personal aide, and in response, the school decided to suspend him for five days. PSOF ¶ 46. One week later, on October 29, 2013, Jacob and a peer purportedly "were not keeping their hands to themselves" in the lunchroom, and, when a teacher and then Principal Hogan intervened, Jacob allegedly punched the teacher's hands and did not comply with her instructions. AR 3019 (cited at DSOF ¶ 62); AR 3600. Consistent with the prior concerns of the parents regarding his need for an evaluation, Jacob instead "screamed" at the Principal and the teacher, and took off and hid under a classroom desk when asked to go to the Principal's office. AR 3019 (cited at DSOF ¶ 62). For this conduct, Principal Hogan decided to suspend Jacob for two days. AR 3600 (cited at PSOF ¶ 48). Sadly, these symptoms were not the only outbursts Jacob suffered. *See* DSOF ¶¶ 62-63; PSOF ¶ 46.

On November 8, 2013, the School District sought to address Jacob's behavioral problems with what some have characterized as an informal, non-IEP "check-in" between the School District and Plaintiffs. AR 2771; Response to DSOF ¶ 46; PSOF ¶ 47. Despite the purported informality of this meeting, the School District prepared and circulated a draft "Functional Behavioral and Behavioral Intervention Plan" before the meeting. DSOF ¶ 46. The Plan, however, was not presented, let alone finalized, at the meeting. DSOF ¶ 46. Also in November 2013, and as a result of Jacob's behavioral incidents in the lunchroom, the School District decided, on its own, to have Jacob eat lunch in a conference room with a general

education peer and his personal aide—and not in the lunchroom with other students. DSOF ¶¶ 62-63; AR 0039-40.

On January 9, 2014, with the assistance of attorneys, the School District and Plaintiffs next convened to formulate Jacob's IEP. DSOF ¶ 47; PSOF ¶ 53. By prior agreement of their counsel, no placement or other significant changes to Jacob's IEP were made. DSOF ¶ 47(e). The January 2014 IEP does show, however, that Jacob was classified with the same two disabilities as before: (1) "Developmental Delay"; and (2) "Other Health Impairment." AR 2778, 2784-85; DSOF ¶ 47(c). Jacob was considered for, but not ultimately classified with, an "Emotional Disability," with the Conference Report explaining: "Although Jacob displays inappropriate types of behavior and feelings under normal circumstances, Jacob is only 6 years old and his social-emotional difficulties" could still fall "under the category of Developmental Delay." PSOF ¶ 55 (citing AR 2782).

Around the same time, Plaintiffs retained the psychologist Dr. Peter Dodzik to evaluate Jacob, and, on January 16, 2014, Dr. Dodzik issued his formal Neuropsychological Evaluation. DSOF ¶ 50; PSOF ¶ 57. In that Evaluation, Dr. Dodzik diagnosed Jacob with Attention Deficit Hyperactivity Disorder and Disruptive Mood Dysregulation Disorder. DSOF ¶ 50(c). Dr. Dodzik also issued a Functional Behavioral Assessment on January 28, 2014 where, based upon classroom observation and his review of the record, Dr. Dodzik proposed a behavioral plan for Jacob. AR 2832-39; DSOF ¶ 50(b); PSOF ¶ 57.

On March 26, 2014, Plaintiffs, the School District and others, including Dr. Dodzik, met to devise an IEP. DSOF ¶ 51; PSOF ¶ 61. Dr. Dodzik shared both of his January 2014 reports at the meeting. DSOF ¶ 50(b); PSOF ¶ 61. The team reached the following decisions about Jacob's academic and behavior needs, and placement.

- **"Emotional Disability" Classification.** Unlike during the January 2014 IEP, Jacob was now classified with an "Emotional Disability" as his primary disability. AR 2856, 2983; PSOF ¶ 63(a). The Conference Notes do not show that Plaintiffs or Dr. Dodzik disagreed with the classification, but they did disagree with listing "Emotional Disability" and not "Other Health Impairment" (Jacob's secondary classification) as Jacob's primary disability. AR 2893.

- **Speech and Language Services.** Based on the formal assessment from and recommendation of the school language pathologist Colleen Proffit, Jacob's speech and language services were discontinued. AR 2876, 2892; 8/26/14 Hearing Tr. at 81-82; DSOF ¶ 51(b). Dr. Dodzik deferred to Proffit's assessment of Jacob and did not voice any objection to her recommendation. 8/26/14 Hearing Tr. at 81-82; DSOF ¶ 51(b).

- **Behavioral Intervention Plan.** A Behavioral Implementation Plan was implemented with express approval from Dr. Dodzik and Andrea Teichmiller, a behavioral consultant with a State certificate in special education who had been retained by the School District earlier that month to assist with the Plan's development. 8/29/14 Hearing Tr. at 15-16; DSOF ¶ 51(c). As for its substance, the Plan provided for a "loss of recess" and an "exclusion from activities," among other disciplinary measures, should Jacob not behave appropriately. AR 2898; DSOF ¶ 70. The Conference Notes reflect that Dr. Dodzik opined that having Jacob lose recess for poor behavior was a "good plan." AR 2894.

It is undisputed, as Plaintiffs acknowledge in their motion papers, that Dr. Dodzik had "considerable input" into the Behavioral Implementation Plan. Response to DSOF ¶ 51(c). Despite maintaining some objections to the Plan, Dr. Dodzik testified, at the later Due Processing Hearing, that the target behaviors for Jacob in the Plan were a "reasonable starting point." 8/26/14 Hearing Tr. at 88-89. This is not to say, however, that Dr. Dodzik had no objections to the Plan. Response to DSOF ¶ 51(e) (citing 8/26/14 Hearing Tr. at 88-89). As a proper member of the IEP team,

Jacob's mother also provided input into the Plan. The Plan included her recommendation that hockey (Jacob's favorite sport) be incorporated into Jacob's motivators and rewards for positive behavior. AR 2894, 2898; *see also* 9/8/14 Hearing Tr. at 68.

- **Placement.** Three placement options were considered, and the parties agreed to place Jacob in the general education kindergarten classroom with social emotional services and resource support. AR 2888-89; DSOF ¶ 51(d). Plaintiffs disagreed with the School District's preferred placement proposal—the Social Emotional Learning Foundations ("SELF") program—so it was not adopted. AR 2889, 2894.

The team agreed to reconvene on May 12, 2014 to revisit Jacob's progress. DSOF ¶ 51(e). That meeting later was moved to June 5, 2014. DSOF ¶¶ 71-72.

Following the March 2014 IEP meeting, Teichmiller observed Jacob in class three to five days per week for the full school day. 8/29/14 Hearing Tr. at 48-49; *see also* DSOF ¶ 52. Yet, despite the addition of Teichmiller and the changes implemented by the March 2014 IEP, Jacob's behavioral struggles continued during spring 2014. Among other incidents, on May 2, 2014, Jacob shook a peer during recess, and hit and kicked a member of the school staff who intervened. DSOF ¶¶ 64, 66; DSOAF ¶ 25.

Based upon these incidents, in May 2014, the School District removed Jacob from having recess on the playground. DSOF ¶¶ 64-66; DSOAF ¶ 25. Instead, the School District allowed Jacob to have indoor recess in the gym or a classroom with one general education peer of his choice. DSOF ¶¶ 64-65; DSOAF ¶ 25. In response to the same incidents, the School District also removed Jacob from Wilson Creek's two-hour Olympic Day (a day of organized games for students) in May 2014, and instead decided to place Jacob in alternate activities. DSOF ¶¶ 67-69. Jacob

ultimately did not participate in any alternate activities as Plaintiffs did not send him to school on Olympic Day.  DSOF ¶ 67.

On June 5, 2014, Plaintiffs, along with their psychologist Dr. Dodzik and their advocate Gary Michaels, and the School District met to revisit Jacob's IEP. DSOF ¶ 72, 72(b); PSOF ¶ 65.  The team considered written and live reports from school staff and outside experts.  DSOF ¶ 72(c) to (g), (i).  Jacob's teacher Wingfield expressed her concerns about Jacob's lack of expected reading progress.  DSOF ¶ 72(c).  Wingfield—along with the school social worker Mishel Rych and the school psychologist Reh—reported on Jacob's continuing behavioral problems, with Rych adding that Jacob was not making expected progress towards reaching the goals from his March 2014 Behavioral Implementation Plan.  DSOF ¶ 72(c) to (e).  As part of the IEP team, the outside behavioral consultant Teichmiller presented her 11-page report and analysis of Jacob's functioning under the Behavioral Implementation Plan.  DSOF ¶ 72(f).  Last, Dr. Dodzik provided his assessment on what changes should be made to the Plan.  DSOF ¶ 72(g).

Based upon these reports and the discussion at the IEP meeting, the School District wanted to place Jacob in the SELF program, over Plaintiffs' objection.  AR 2929; PSOF ¶ 66.  School staff explained that the program would provide Jacob with what they claimed was "the most intensive, appropriate support."  AR 2929. SELF is a structured program for certain children who require social-emotional support.  There are three students per class, and each class is supported by a special education teacher, a full-time social worker, a full-time psychologist and

other staff.  DSOF ¶¶ 72(i), 73(a).  The SELF program, however, is a restricted form of education and not part of the mainstream classroom (which is located in an entirely different building approximately 300 to 500 feet away).  DSOF ¶73(e); Supplemental Ostby Affidavit [51-3] ¶ 8.

Despite not being able to agree upon a placement, the team did agree on certain revisions to Jacob's Behavioral Implemental Plan.  Apart from the placement, Dr. Dodzik testified that the ultimate Plan produced at the meeting was "reasonable."  8/26/14 Hearing Tr. at 101 (cited at DSOF ¶ 72(g)).  The Conference Notes from the meeting also show that the School District incorporated Dr. Dodzik's recommendations for changing Jacob's Behavioral Implemental Plan.  AR 2936.

### 4.    2014 to 2015 School Year (First Grade)

Although not material to the decision here, this Court understands from the hearing officer's decision and the supplemental materials filed by Plaintiffs that during the next school year, Jacob remained in the general education classroom and was not placed in the separate classroom for the SELF program, as proposed by the June 2014 IEP.  Supplemental Materials [88]; AR 0015; *see also* PSOF ¶ 1.  This presumably is the result of the IDEA's stay-put provisions, which, as discussed below, freeze a child's educational placement during the pendency of due process proceedings.  20 U.S.C. § 1415(j).

More recently, the parties also reported to this Court that, apart from the issues asserted here (such as financial reimbursement), a general consensus is

thankfully emerging among the parties regarding Jacob's placement and educational plan going forward.  12/17/15 Status Hearing [108].

## B.    Procedural History

The parties commenced the underlying administrative action during December 2013 to January 2014, in the middle of the 2013 to 2014 school year, when they filed separate Due Process Complaint Notices.  DSOF ¶ 48; PSOF ¶¶ 51, 56.  On December 6, 2013, the School District filed a Due Process Complaint, but withdrew that Complaint on March 7, 2014.  AR 0014, 0016; PSOF ¶ 51.  On January 20, 2014, Plaintiffs filed their Due Process Compliant.  DSOF ¶ 48; PSOF ¶ 56.  Plaintiffs filed an additional Due Process Complaint on June 13, 2014.  PSOF ¶ 69.

Plaintiffs' Complaints were consolidated into Case No. 2014-0250, and a six-day Due Process Hearing was held before an administrative hearing officer, Josette Allen, between August 25 and September 8, 2014.  AR 0014; DSOF ¶ 8; PSOF ¶ 72.  The parties presented testimony from 14 witnesses.  AR 0017.  As set forth by the hearing officer, and summarized here, the parties addressed seven issues at the hearing:

1.   Whether the School District failed to adequately assess all areas of Jacob's suspected disability.

2.   Whether the School District failed to explain to Parents that the Early Childhood Program was available at no cost.

3.   Whether the School District predetermined placement at the March 2014 IEP and the June 2014 IEP.

4. Whether stay-put was violated by restricting Jacob's lunch, recess and Olympic Day activities in 2012.

5. Whether the June 2014 IEP provides Jacob with a free appropriate public education ("FAPE") in the least restrictive environment.

6. Whether the School District failed to reimburse Plaintiffs for the evaluations they obtained from Dr. Carbone, Dr. Ferre and BDI Playhouse.

7. Whether the School District failed to reimburse Plaintiffs for placing Jacob in Kid Country and for transporting him between Kid Country and his speech and language classes at Wilson Creek.

AR 0018; DSOF ¶ 9.

On September 22, 2014, the hearing officer issued a 38-page decision. DSOF ¶ 13; PSOF ¶ 73. The hearing officer ruled for the School District on all issues, except that she determined that the District had to reimburse Plaintiffs $773.90 for their post-insurance, out-of-pocket expenses in obtaining independent evaluations of Jacob from Dr. Carbone and Dr. Ferre. AR 0014; DSOF ¶ 13. Pursuant to 20 U.S.C. § 1415(i)(2)(A), Plaintiffs now bring an administrative review action in this Court challenging each one of the hearing officer's decisions and adding that the hearing officer made three procedural errors during the Due Process Hearing.

## III.  Analysis

As noted above, the IDEA requires States receiving federal funding to make a FAPE available to all children with disabilities residing therein. 20 U.S.C. § 1412(a)(1)(A); *see also Forest Grove School District v. T.A.*, 557 U.S. 230, 232 (2009). A FAPE is specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the

instruction. *Rowley*, 458 U.S. at 188-89; *Board of Education of Murphysboro Community Unit School District No. 186 v. Illinois State Board of Education*, 41 F.3d 1162, 1166 (7th Cir. 1994).

To comply with the IDEA, the School District must satisfy two obligations. *See Rowley*, 458 U.S. at 206-07; *Board of Education of Murphysboro Community Unit School District No. 186*, 41 F.3d at 1166. First, the School District must meet the guaranteed procedural safeguards set forth in 20 U.S.C. § 1415. *Rowley*, 458 U.S. at 206-07; *Board of Education of Murphysboro Community Unit School District No. 186*, 41 F.3d at 1166. Second, the District must develop an IEP that is reasonably calculated to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 206-07; *Board of Education of Murphysboro Community Unit School District No. 186*, 41 F.3d at 1166. Once it is determined that the School District has met these dual requirements, this Court's task is complete.

Here, Plaintiffs challenge both the School District's procedural and substantive compliance with the IDEA. Then, Plaintiffs argue that they are entitled to reimbursement under the IDEA for certain expenses they incurred in connection with developing Jacob's IEP. This Court addresses each category of challenges in turn in Subsections A to C below.

## A. Procedural Challenges

Turning first to the procedural challenges, procedural violations are actionable only if they: (1) impeded the child's right to a FAPE; (2) significantly impeded Plaintiffs' opportunity to participate in the decision-making process as a

full member of the IEP team; or (3) caused a deprivation of educational benefits.  20 U.S.C. § 1415(f)(3)(E)(ii).  Here, Plaintiffs levy five categories of procedural challenges against the School District and the hearing officer.  Each is addressed in turn below.

### 1.    Adequate Assessment

Plaintiffs first argue that the School District failed to conduct an adequate investigation into Jacob's suspected disability during the 2011 to 2012 school year. Plaintiffs argue that the School District failed to identify Jacob's behavioral disabilities at the outset of the school year, thereby precluding the development of an appropriate IEP for the child.

The IDEA requires that school districts locate, identify and evaluate all children with disabilities from birth through age 21, including children who attend private schools.  20 U.S.C. § 1412(a)(3).  The statute does not require specific testing in every conceivable area of disability, but rather it only requires assessments in all areas of "suspected disability."  20 U.S.C. § 1414(b)(3)(B); *see also Jaccari J. v. Board of Education of City of Chicago, District No. 289*, 690 F. Supp. 2d 687, 706 (N.D. Ill. 2010).  A school district thus is liable under IDEA for failing to identify a student with a disability either when: (1) the district has overlooked "clear signs of disability" and was "negligent in failing to order testing"; or (2) "there was no rational justification for not deciding to evaluate."  *Demarcus L. v. Board of Education of the City of Chicago, District 299*, No. 13-5331, 2014 WL 948883, at *5 (N.D. Ill. Mar. 11, 2014) (citing Sixth Circuit and New York federal cases).

Here, this Court has independently reviewed the relevant factual background and, giving due deference to the hearing officer's determinations, finds that no meaningful procedural error exists, even though the hearing officer erroneously found that the School District did not learn of Jacob's potential behavioral issues until March 2012.

In a December 14, 2011 memo to Plaintiffs, Kid Country, Jacob's private preschool, reported that Jacob had behavioral problems requiring attention. AR 4213-14 (cited at DSOF ¶ 22). Jacob's mother testified that she forwarded the memo to Principal Hogan that same month, PSOF ¶¶ 12-14, but the hearing officer disregarded that testimony, and found that the School District was purportedly not on notice of any suspected behavioral disability because the School District did not learn of the memo or Plaintiffs' request for a behavioral evaluation until March 2012. AR 0033-34; DSOF ¶¶ 20, 22; PSOF ¶ 17.

This factual finding was made despite clear evidence in the record, including testimony from Principal Hogan herself, which corroborated the parents' evidence about voicing their behavioral concerns earlier, both orally and in writing. When asked about her knowledge of Jacob back in 2011, Principal Hogan testified that "the Ostbys expressed a concern to me about behavior" even though she did "not recall the exact timing" of that notice. 8/26/14 Hearing Tr. at 227. Likewise, in her testimony, Principal Hogan confirmed that she was "aware of the Ostby's concerns regarding Jacob's behavior" prior to March 2012, and when asked specifically about the fax copy of the report from Kid Country Director Donna Phelan (containing

observations and recommendations regarding Jacob's behavioral struggles), Principal Hogan's testimony failed to undermine the parents' account, because she did not "remember the exact date" and thus could only state her belief regarding the timing of the fax. 8/26/14 Hearing Tr. at 227. When asked again about the timing of the fax on cross-examination, Principal Hogan could only state that she did not remember if she got it earlier:

> Q. And had you received that – this communication, the copy of the memo from Donna Phelan, found on 32 and 33, prior to receiving that fax from Mrs. Ostby at the end of April in 2012?
>
> A. I do not remember having it before that. The only copy I had in the file wasn't the one faxed to me.

8/26/14 Hearing Tr. at 229. Despite such evidence in the record, the hearing officer made a factual finding that the School District did not receive of the issues raised in Kid Country memo, or otherwise learn of any potential behavioral problems, prior to March 2012, and thus, Jacob had only presented to the School District with speech and language impairments. PSOF ¶¶ 3-4; *see also* AR 2614. Based upon the record as whole, this Court finds this factual conclusion to be an erroneous, but harmless, assessment of the timing.

Specifically, this error remained harmless, because the School District's response for the 2011 to 2012 school year remained adequate. Upon learning of Plaintiffs' concerns in late 2011, Principal Hogan followed up on that information and spoke with the Director of Kid Country, and also met with Jacob's speech therapist to see if she had observed any behavioral problems (she did not); and Principal Hogan also reviewed the results of Jacob's preschool and kindergarten

screenings (neither showed behavioral issues). AR 2614 (cited at DSOF ¶ 21); 8/26/14 Hearing Tr. at 227-31; DSOF ¶ 24; PSOF ¶ 18. The School District then met with Plaintiffs in April and May 2012. DSOF ¶¶ 21, 24-25; PSOF ¶¶ 19, 22. At the May 2012 IEP meeting, the School District demonstrated "good faith," according to the hearing officer, AR 0034, by then enrolling Jacob in Wilson Creek's Early Childhood special education classroom on a trial basis. AR 2621, 2634-36; DSOF ¶ 25; PSOF ¶ 23. Ultimately, Plaintiffs agreed with that placement. DSOF ¶ 25; PSOF ¶ 23.

Even though the School District learned of the parents' and Kid Country's behavioral concerns prior to March 2012, those concerns were not so substantial, in light of all of the evidence, as to require an immediate formal testing of Jacob for a behavioral impairment, nor have Plaintiffs, despite bearing the burden of proof, marshalled sufficient evidence to allow this Court to determine what educational benefits, if any, were actually lost from late 2011 to March 2012, such that Jacob did not receive a FAPE. 20 U.S.C. § 1415(f)(3)(E)(ii); AR 0033. This finding is also corroborated by the evidence the School District presented at the IEP meeting to support their initial denial of further testing at that time. AR 2612; DSOF ¶ 24.

For these reasons, Plaintiffs' adequate assessment argument fails.

## 2.  Availability of Early Childhood Program

Also regarding the 2011 to 2012 school year, Plaintiffs next argue that the School District failed to inform them at the October 2011 IEP meeting that the Early Childhood program was available to Jacob. The School District did not agree

to place Jacob in the Early Childhood Program until May 2012, when they did so merely on a trial basis. DSOF ¶¶ 25-26.

This Court, based on its independent review of the record, agrees with the hearing officer's determination that Plaintiffs failed to show that Jacob was eligible for the Early Childhood program back in October 2011. AR 0033-34. That program was meant to address behavioral concerns, but the initial evidence before the School District at that time, namely, Jacob's preschool screening and referral, showed only that Jacob may require speech therapy, and the other behavioral concerns of the parents and Kid Country were not raised until later. PSOF ¶¶ 3-4. This Court further refers to its analysis in the preceding section showing that the School District lacked sufficient information, at the relevant time, to warrant placing Jacob in the Early Childhood program in October 2011.

Nevertheless, Plaintiffs point to 34 C.F.R. § 300.115, which requires the School District to provide for sufficient placement options to "ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services." Plaintiffs mistake the import from this regulation. Section 300.115 requires only that the School District have a continuum of alternate placements *available* at its disposal so that the IEP team can select the appropriate placement for a child. *James D. v. Board of Education of Aptakisic-Tripp Community Consolidated School District No. 102*, 642 F. Supp. 2d 804, 821-22 (N.D. Ill. 2009). Section 300.115, by its very language, does

not itself establish that all or any particular placement options be proposed at any given IEP meeting.

Plaintiffs thus have not shown that the School District committed an actionable procedural error by not proposing the Early Childhood program at the October 2011 IEP meeting.

### 3. Predetermined Placement

Plaintiffs argue that the School District predetermined Jacob's placement in the March 2014 IEP and the June 2014 IEP. In the March 2014 IEP, the team classified Jacob with an "Emotional Disability." AR 2856, 2983; PSOF ¶ 63(a). In the June 2014 IEP, the School District (over Plaintiffs' objections) decided to place Jacob in the SELF program (but later did not implement that placement due to the IDEA's stay-put requirements). AR 2929; PSOF ¶ 66.

The IDEA assures that parents have an active and meaningful role in the development or modification of their child's IEP. 34 C.F.R. § 300.116(a)(1); *Hjortness v. Neenah Joint School District*, 507 F.3d 1060, 1064 (7th Cir. 2007). School Districts, accordingly, cannot predetermine a child's placement in advance of an IEP meeting. But there is no predetermination when, as in *M.B. v. Hamilton Southeastern Schools*, 668 F.3d 851, 861 (7th Cir. 2011), the record shows that the school district acts in good-faith and ultimately adjusts the child's IEP according to the views of the parents and their expert consultants. The evidence in *M.B.* showed, as here, that the school district there had relied upon the parent's expert's report to generate the child's goals and objectives. *M.B.*, 668 F.3d at 861.

Likewise, in *J.D. v. Crown Point School Corp.*, No. 10-508, 2012 WL 639922, at *14-15 (N.D. Ind. Feb. 24, 2012), the Court rejected the parents' predetermination claim. The records of the IEP meetings showed that the school district there had provided the parents with the opportunity for meaningful feedback and, as here, modified the IEP based on that feedback. *Id.* at *15. The Court in *J.D.* further rejected the notion that the school district merely disagreeing with parents was, by itself, proof that the parents were denied the requisite opportunity to participate as a full-fledged member of the IEP team, on equal footing with the school district. *J.D.*, 2012 WL 639922, at *15; *see also Board of Education of Township High School District No. 211 v. Michael R.*, No. 02-6098, 2005 WL 2008919, at *14-15 (N.D. Ill. Aug. 15, 2005) (making the same point).

The facts here mirror those cases, and those cases confirm that the School District's disagreement with Plaintiffs on Jacob's "Emotional Disability" classification and SELF placement, without more, does not equate to predetermination under the IDEA. In this case, the hearing officer specifically concluded that Plaintiffs had failed to provide sufficient evidence of predetermination, AR 0042, and, after conducting an independent review of the record, this Court sees nothing now that warrants departing from that conclusion. This Court now turns to the specifics of the March 2014 IEP and the June 2014 IEP, and addresses each one in order.

Plaintiffs principally argue that at the March 2014 IEP meeting, the School District falsely classified Jacob with an "Emotional Disability" so that they could

later place him in the SELF program. But the portions of the record Plaintiffs cite do not substantiate that claim. Plaintiffs claim that the "Emotional Disability" classification must have been predetermined because it could not be applied to children younger than nine-years-old, such as Jacob at that time; and that, three months earlier, at the January 2014 IEP meeting, the School District purportedly "stated that "Emotional Disability" was not a proper category for eligibility because J.O. was only 6 years old." [67] at 33-34 (citing AR 2784). That is incorrect. In the "Determination of Developmental Delay" section, the January 2014 IEP contains a checked box indicating "student is three through nine years of age," AR 2784, but that in no way limits an "Emotional Disability" classification to children older than nine years.

Plaintiffs emphasize that the School District did not classify Jacob with an "Emotional Disability" in January 2014, however, the School District's reasons for that decision (right or wrong) did not preclude it from later classifying Jacob with an "Emotional Disability." When explaining why Jacob was not being classified with an "Emotional Disability" in January 2014, the School District recognized that Jacob did have emotional struggles and previewed its later classification decision. PSOF ¶ 55. The School District wrote: "Although Jacob does display inappropriate types of behavior and feelings under normal circumstances, Jacob is only 6 years old and his social-emotional difficulties could remain to fall under the category of Developmental Delay." PSOF ¶ 55 (citing AR 2782).

Plaintiffs also have placed form over substance. Plaintiffs have not explained why the "Emotional Disability" label matters when if, as is the case here (*see* Subsection B below), Jacob's placement nonetheless would have been appropriate even if he had not been labeled with an "Emotional Disability." A similar point was emphasized in *School District of Wisconsin Dells v. Z.S.*, 295 F.3d 671, 676 (7th Cir. 2002), where the Seventh Circuit discredited the hearing officer's focus upon whether the child there was, in fact, autistic. Essentially, the child's diagnosis was just a label that did not change the appropriateness of his particular placement under the IDEA mandate. *Z.S.*, 295 F.3d at 676; *see also Heather S.*, 125 F.3d at 1055; *Edwin K. v. Jackson*, No. 01-7115, 2002 WL 1433722, at *16 (N.D. Ill. July 2, 2012).

Turning now to the June 2014 IEP, this Court, based on its independent review of the record as a whole, concurs with the hearing officer's decision that the School District's SELF placement (right or wrong) was not predetermined. The hearing officer focused on the School District's course of conduct leading up to and at the June 2014 IEP meeting. AR 0041-42. In particular, the School District: (1) waited nine months (over the course of the October 2013 meeting, January 2014 IEP and March 2014 IEP) before trying to change Jacob's placement so that Plaintiffs could have private evaluations of Jacob completed, which rebuts Plaintiffs' assertion that the School District changed Jacob's placement in haste; and (2) incorporated Plaintiffs' own evaluations into Jacob's IEP, as the school in *M.B.* also did. AR 0041-42. Like in *M.B.* and *J.D.*, the Conference Notes from the

June 2014 IEP reflect that the School District incorporated Dr. Dodzik's recommendations for changing Jacob's Behavioral Implementation Plan. AR 2936. Dr. Dodzik further testified that the ultimate Plan produced at the meeting was "reasonable." 8/26/14 Hearing Tr. at 101 (cited at DSOF ¶ 72(g)).

For both the March 2014 IEP and the June 2014 IEP, this Court also concurs with the hearing officer's credibility determinations. The hearing officer observed that the School District's witnesses were purportedly "visibly concerned" about Jacob's well-being and "appeared to have an open mind." AR 0042. By comparison, the hearing officer drew an adverse evidentiary inference against Plaintiffs because they failed to call two witnesses—Dr. Dodzik and their advocate—to substantiate their predetermination claim at the administrative due process proceeding, even though those witnesses appeared on Jacob's behalf at the June 2014 IEP. AR 0041-42; DSOF ¶ 72(b). These witnesses presumably would have substantiated Plaintiffs' predetermination claim if, in fact, there was predetermination. Yet the meeting notes show that was not the case: At the June 2014 IEP, Plaintiffs and their representatives had the opportunity to discuss and question Jacob's placement options. DSOF ¶ 72(b) (citing AR 2934-36).

The hearing officer provided even more support for her ultimate decision on this claim, AR 0042-43, but this Court need not say more on the issue. Plaintiffs' predetermination claim fails.

### 4. Stay-Put

Under the IDEA's "stay-put" provision, during "the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j); *see also* 34 C.F.R. § 300.518. This legal requirement is firm, but not rigid. The Seventh Circuit has interpreted "educational placement" to incorporate enough flexibility to encompass the child's experience. *John M. v. Board of Education of Evanston Township High School District 202*, 502 F.3d 708, 714-15 (7th Cir. 2007). A rigid interpretation of the IDEA's stay-put requirement, by comparison, would impede the ability to make even minor changes to the educational programs provided to children. *Id.* at 714. An instructive example from the Seventh Circuit of a prohibited change during stay-put is moving a child from a special class (in a regular school) to a special school. *Id.* at 715. Here, Plaintiffs argue that the School District contravened the IDEA's stay-put requirements for three reasons.

First, Plaintiffs challenge the School District's November 2013 decision to have Jacob eat lunch in a conference room with a general education peer and his personal aide—and not in the lunchroom with other students. *See* AR 0039-40; DSOF ¶¶ 62-63. The School District made this decision after Jacob had two behavioral incidents with peers in the lunchroom during October and November 2013. DSOF ¶¶ 62-63; PSOF ¶ 46.

Plaintiffs' first challenge fails for procedural reasons. The IDEA's stay-put requirement is not triggered until due process proceedings are initiated, here, December 6, 2013 at the earliest. 20 U.S.C. § 1415(j); *see also* 34 C.F.R. § 300.518 cmt. The undisputed record shows that the School District changed Jacob's lunch program in November 2013—before Defendants and Plaintiffs filed due process notices (on December 6, 2013 and January 20, 2014, respectively). Thus stay-put had not yet been triggered. Based upon the evidence presented, the hearing officer further found that Plaintiffs failed to object to the change to Jacob's lunch setting when raised at the November 2013 IEP meeting. AR 0040. This Court agrees based upon its independent review of the record. *See* 8/26/14 Hearing Tr. at 189, 300-02 (cited at DSOF ¶ 63).

Second and third, Plaintiffs challenge the School District's modifications both to Jacob's recess and his participation in the Olympic Day activities. Jacob had multiple behavioral issues with peers, including on May 2, 2014, when Jacob shook a student during recess, and hit and kicked the school staff who intervened. DSOF ¶ 64, 66; DSOAF ¶ 25. Based on these behavioral struggles, in May 2014, the School District removed Jacob from having recess on the playground. DSOF ¶¶ 64-66; DSOAF ¶ 25. Instead, the School District provided Jacob with indoor recess in the gym or a classroom with one general education peer of his choice. DSOF ¶¶ 64-65; DSOAF ¶ 25. Also in May 2014, and in response to the same behavioral issues, the School District removed Jacob from Wilson Creek's two-hour Olympic Day and

instead placed him in alternate activities. DSOF ¶¶ 67-69. Jacob's parents ultimately did not send Jacob to school on Olympic Day. DSOF ¶ 67.

This Court agrees, as the hearing officer found, AR 0040-41, that the School District's modifications to Jacob's recess and Olympic Day activities aligned with the then-effective March 2014 Behavioral Intervention Plan. The IEP team—which included Jacob's parents and their representatives as full partners—had agreed in the Plan to a "loss of recess" and an "exclusion from activities," among other behavioral measures, should Jacob present with certain behavioral symptoms. AR 2898; DSOF ¶¶ 51, 70. Dr. Dodzik even opined that having Jacob lose recess for poor behavior was a "good plan." AR 2894. That is exactly what the School District did. Likewise, in *A.L. v. Chicago Public School District No. 299*, No. 10-494, 2011 WL 5828209, at *8 (N.D. Ill. Nov. 18, 2011), the Court denied a student's stay-put challenge where the student received exactly what the IEP required. The IEP there required only four weeks of extended school in 2009 and not, as the student argued, six weeks. *Id.*

For these reasons, Plaintiffs' stay-put challenges fail.

### 5. Due Process Hearing

Procedural violations committed by the hearing officer at the Due Process Hearing, like the purported procedural violations committed by the School District, only violate the IDEA if they "result in the loss of educational opportunity." *Heather S.*, 125 F.3d at 1059; *see also James D.*, 642 F. Supp. 2d at 819 n.11. Here, in their moving papers, [50-1] at 1 and [51] at 3, Plaintiffs have listed three

purported procedural violations committed by the hearing officer, yet have failed to develop the substance of those arguments in their motion papers. Mere mention of arguments will not save them from waiver, so this Court need not go any further. *Mitsui Sumitomo Insurance Co., Ltd. v. Moore Transportation, Inc.*, 500 F. Supp. 2d 942, 950-51 (N.D. Ill. 2007). Nonetheless, even considering the merits of Plaintiffs' three challenges, the record fails to contain a sufficient basis for this Court to find a relevant procedural error at the due process hearing.

### a) Offer of Proof

Plaintiffs argue that the hearing officer failed to hold a fair and impartial hearing by rejecting an offer of proof. Presumably Plaintiffs are referring to the events of September 8, 2014 (the last day of the Due Process Hearing) when the hearing officer upheld Defendants' objection and barred Plaintiffs from introducing into evidence a photograph because the photograph had not been disclosed in accordance with the IDEA's five-day disclosure requirement, which is incorporated in the Illinois School Code. DSOAF ¶ 27; 34 C.F.R. § 300.512(a)(3); 23 Ill. Admin. Code § 226.625. Although the photograph itself was barred, Plaintiffs did in fact (despite some back and forth in the record) make an offer of proof, that is, Plaintiffs described the subject of the precluded photograph and stated its intended use on the record. DSOAF ¶ 28. The photograph, as Plaintiffs explained in their offer of proof, showed the distance between the general education building and the separate building where the SELF program was held, and Plaintiffs sought to introduce the

photograph as part of their cross-examination of the School District's Director of Student Services (Renee Karalus). DSOAF ¶¶ 27-28.

From this record, this Court sees no material error. The purpose of an offer of proof is to disclose the nature of the offered evidence so that a reviewing court can determine whether the exclusion was erroneous and harmful. *Sekerez v. Rush University Medical Center*, 954 N.E.2d 383, 398 (Ill. App. Ct. 2011). That was done here.

Even if the exclusion was erroneous, and it is not, any error was not so significant as to give rise to a FAPE violation. 20 U.S.C. § 1415(f)(3)(E)(ii). The photograph was cumulative with the other evidence in the record showing the distance between the two buildings. Supplemental Ostby Affidavit [51-3] ¶ 8; 9/8/14 Hearing Tr. at 45-46 (cited at DSOAF ¶¶ 27-28); DSOF ¶ 73(e). Similarly, in *L.S. v. Board of Education of Lansing School District 158*, No. 14-10052, 2015 WL 3647759, at *7 (N.D. Ill. June 11, 2015), the hearing officer denied expert testimony about the child's projected academic performance in a new school, and the Court found that the evidentiary error, if any, was harmless because the denied testimony was cumulative with other evidence in the record. *See also Sekerez*, 954 N.E.2d at 398. That is the case here too.

### b)      Advocate Exclusion

The School District moved to exclude Plaintiffs' advocate, Gary Michaels, from the Due Process Hearing until he was called to testify. DSOAF ¶ 29; PSOF ¶ 74. The hearing officer granted that motion because Michaels was on Defendants'

Final Witness List for Hearing. DSOAF ¶ 29; PSOF ¶ 74. Ultimately, Michaels was excluded only for the testimony of a single witness. DSOAF ¶ 29.

Plaintiffs object to this decision, but that objection fails. Under the Illinois School Code, parties can move to exclude witnesses, such as Michaels, from the Due Process Hearing until they are called to testify—unless that witness is the individual designated by the other party to assist them in the presentation of their case. 105 ILCS 5/14-8.02a(g-55). Plaintiffs did not designate Michaels as an individual who would be assisting them, so the exception to Section 14-8.02a does not apply here. Thus the hearing officer committed no legal error and, even if she did, Plaintiffs have marshalled no evidence or argument showing that Michael's limited exclusion for a single witness was so serious as to deny Jacob a FAPE. 20 U.S.C. § 1415(f)(3)(E)(ii).

### c) Rebuttal Witness

Plaintiffs last argue that the hearing officer failed to allow for rebuttal witnesses. As shown by Defendants' motion papers, [63] at 37-38, this argument is limited to the hearing officer's decision to bar Jacob's mother from offering rebuttal testimony about Jacob's first grade performance during the 2014 to 2015 school year. The hearing officer barred that testimony because it was not relevant to the appropriateness of the June 2014 IEP. DSOAF ¶ 30. This Court agrees, as there is no dispute that the appropriateness of the June 2014 IEP is determined at the time it is offered and not by looking at the IEP in hindsight. *Jaccari J.*, 690 F. Supp. at 702 n.11 (citing *J.G. v. Douglas County School District*, 552 F.3d 786, 801 (9th Cir.

2008); *Fuhrmann v. East Hanover Board of Education*, 993 F.2d 1031, 1040 (3d Cir. 1993)).

Any error is harmless, moreover, because this Court has allowed Plaintiffs to supplement the record with Jacob's first grade school records. *See, e.g.*, [87] and [114]. For the same reason, in *Michael R.*, 2005 WL 2008919, at *25, the district court found any error to allow certain evidence in the due process hearing to be harmless.

For these reasons, Plaintiffs' three procedural challenges to the due process hearing fail.

## B.    Substantive Challenges

As noted above, under the second, substantive criterion of *Rowley*, 458 U.S. at 207, the challenged IEP must be "reasonably calculated" to enable the child to receive educational benefits and also must respond to "all significant facets of the student's disability, both academic and behavioral." *Alex R.*, 375 F.3d at 613; *see also Z.S.*, 295 F.3d at 677. The issue is whether the School District's proposed placement was appropriate under the law, not whether another placement also would have been appropriate or even better. *Heather S.*, 125 F.3d at 1057. The School District must provide a FAPE in the "least restrictive environment" possible, meaning that the child is mainstreamed to the greatest extent appropriate. 20 U.S.C. § 1412(a)(5); *see also Beth B.*, 282 F.3d at 498.

Here, Plaintiffs challenge the proposed placement change in the June 2014 IEP. This Court now addresses below whether the June 2014 IEP was reasonably

calculated to confer educational benefit (Subsection 1) in the least restrictive environment (Subsection 2).

### 1. FAPE

An IEP is "reasonably calculated" to confer educational benefit when it is likely to produce progress, not regression or trivial educational advancement. *Alex R.*, 375 F.3d at 615. The Seventh Circuit has stated that the "requisite degree of reasonable, likely progress varies, depending on the student's abilities." *Id.* Objective factors, such as regular advancement from grade to grade, and achievement of passing grades, tend to lend support for a showing of satisfactory progress. *Id.*

Here, the June 2014 IEP proposed moving Jacob from a general education placement with supports, to the SELF program. Despite Plaintiffs' challenges, they have failed to show that this proposed placement change was not appropriate given Jacob's academic regression and behavioral challenges in a general education classroom which already had substantial supports.

Addressing Jacob's academic performance first, the record shows that Jacob was regressing, even though he technically met some of the School District's minimum academic expectations for kindergarten students, as measured by standardized tests.[2] Those snapshot test scores in isolation, however, are

---

[2] The Rigby Benchmarking Assessment, which was administered on May 5, 2014, placed Jacob's reading at Level C (with Level A being the worst)—the minimum expectation for kindergarten students. AR 2913; 8/27/15 Hearing Tr. at 153 (cited at DSOF ¶ 73(c)). On AIMSweb, which was administered in spring 2014, Jacob scored in the average to above-average ranges for letter naming fluency (average), letter sound fluency (average), nonsense

misleading, failing to capture the downward trajectory of Jacob's academic performance.

For example, Wingfield, Jacob's kindergarten teacher, testified that Jacob had regressed from the start to the end of the 2013 to 2014 school year. DSOF ¶ 73(c). Wingfield explained that Jacob "went from being in the highest reading group to being in one of the lowest," and that he had lost "a lot of his sight word knowledge" and "some of his letter sounds." 8/27/15 Hearing Tr. at 147 (cited at DSOF ¶ 73(c)). Wingfield further considered Jacob's standardized test results and explained that the tests were limited. 8/27/15 Hearing Tr. at 147-48 (cited at DSOF ¶ 73(c)). The tests measured "isolated, rote skills," but did not measure Jacob's ability to put those skills together and achieve reading fluency. 8/27/15 Hearing Tr. at 148 (cited at DSOF ¶ 73(c)). Had Jacob's reading progressed as it should have, Wingfield expected that Jacob would have been at Level F—two rungs better than Level C. 8/27/15 Hearing Tr. at 153-54 (cited at DSOF ¶ 73(c)). At the due process proceeding, the hearing officer opined that Wingfield was a "strong witness who provided a lot of substantive information" about the child, and this Court agrees based upon its independent review of the record. AR 0048.

As with his academic performance, Jacob's behavior was not meeting his goals in a general education setting, despite receiving substantial support. As always, an IEP team may, and should, independently consider a student's behavioral issues, *see Alex R.*, 375 F.3d at 613, and whether those issues are

---

word fluency (average) and phoneme segmentation fluency (above-average). AR 2913; PSOF ¶ 68 (citing AR 4200).

impeding the student's learning. This convergence of educational and behavioral/psychological issues is not uncommon in children with disabilities and lends support for the collaborative scheme designed by Congress, in which parents and independent consultants play central roles within the IEP process. 20 U.S.C. § 1414(d). Teachers and staff of a school district, although often experts in education, sometimes lack the expertise or factual basis to properly understand on their own what may be happening with a child holistically. As such, an observant parent, or an outside expert with the right qualifications, will often know more, or can learn more in a short observation, than a teacher might know or learn in an entire school year. Accordingly, a full IEP team, reviewing the interrelation of academic and other issues, remains a vital feature of the requisite process.

Such a review occurred in this case, and as the hearing officer found, AR 0048-49, the Administrative Record contains substantial, credible evidence supporting the SELF program placement, and Plaintiffs have failed to present sufficient contrary evidence. DSOF ¶ 55 (citing testimony from Jacob's teacher, Wingfield; AR 2913 (report from Wingfield); AR 2951, 2955 (report from outside expert, Teichmiller). In its independent review of the record, this Court emphasizes the following evidence in support of the proposed placement.

First, on May 30, 2014, Andrea Teichmiller, an outside expert, wrote an 11-page report based upon her classroom observations of Jacob from March 11 to May 30, 2014. AR 2946-55 (cited at DSOF ¶ 73(f)). Teichmiller explained the purpose of her report as providing an overview of Jacob's "current placement, ongoing

accommodations and behavioral interventions" implemented after the March 2014 IEP. AR 2946 (cited at DSOF ¶ 73(f)). Based on her observation and accompanying analysis of Jacob's behavior and needs, as well as her expertise, Teichmiller concluded that Jacob should be placed in a different educational setting. AR 2954-55 (cited at (cited at DSOF ¶ 73(f)). She concluded:

> It is suggested that [Jacob] be educated in an environment that can support appropriate relationships, learn to display empathy for others, learn to alter his own behavior to conform to the standards in place, accept responsibility for some (if not all of) his actions, value another's point of view, and accept authority. At this time, these areas are impacting his education to such an extent that academic, social, and emotional progress have been impeded.

AR 2955 (cited at DSOF ¶ 73(f)); *see also* 8/29/14 Hearing Tr. (cited at DSOF ¶ 72(i)). According to this review, Jacob's academic and behavioral goals were not possible in a general education setting where, for example, Jacob could not receive immediate, frequent correction to address his anger and insensitivity towards peers. AR 2954-55 (cited at DSOF ¶ 73(f)).

Second, at the Due Process Hearing, Teichmiller reaffirmed in even stronger language that a new placement must be made. 8/29/14 Hearing Tr. at 94-97. As one of the proper alternatives, Teichmiller advocated placement in the SELF program:

> Q. And at that time [during the June 2014 IEP meeting] did you recommend based upon your work and experience with Jacob that he continue to spend the majority of his day in a general education setting with the support of social work and a behavior intervention plan.
>
> A. No. I did not feel that that was meeting his needs.
>
> Q. And how was it not meeting his needs in your opinion?

A. I felt that he needed more support systems. He needed trained staff to be able to address the teachable moments that were occurring throughout his day that could not be done in a Gen Ed setting.

Q. Did you make any recommendations regarding a program or placement for Jacob?

A. Typically what we would look at, children who exhibit the similar characteristics, the disrespect, the unpredictable behavior, the impulsivity, the lack of remorse, the trouble with social skills, when we see a child present with those characteristics, we would recommend placement within our co-op called the SELF program.

8/29/14 Hearing Tr. at 95.

Teichmiller further rejected the idea that further adjustments to the general education program could be adequate in lieu of placing Jacob in the SELF program. 8/29/14 Hearing Tr. at 97. Teichmiller believed the School District had "implemented everything [it] could within that particular setting." 8/29/14 Hearing Tr. at 97.

Like the administrative hearing officer, this Court credits Teichmiller's opinions. The hearing officer described Teichmiller as a professional with "extensive experience with special education." AR 0048. Likewise, Dr. Dodzik, the psychologist retained by Plaintiffs, testified that Teichmiller had a "pretty good handle on what she was observing from a behavioral standpoint and … her observations were fairly consistent with my own." DSOF ¶ 52(b) (citing 8/26/14 Hearing Tr. at 51). Given their extensive expertise and good handle on Jacob's behavior, both Teichmiller and Dr. Dodzik are the kind of education experts (one hired by the school district and the other by the parents) whose judgment, according to the Seventh Circuit, warrants this Court's deference in identifying the proper

placement of a child with special needs. *Z.S.*, 295 F.3d at 676-77; *Beth B.*, 282 F.3d at 499.

In response, Plaintiffs attempt to portray Teichmiller's report as concluding that Jacob's behavior was improving, but that is mistaken. In her chronology at the beginning of the report, as Plaintiffs point out, Teichmiller includes three dates when Jacob's behavioral expectations (which are measured as the percentage of good behavior points Jacob receives out of the daily maximum) were increased. AR 2946-47 (cited at DSOF ¶ 73(f)). An increase in expectations does not mean Jacob's behavior improved, and Plaintiffs have not drawn that connection. Nor does an increase in expectations deny Teichmiller's bottom line conclusion that Jacob needed a placement with more supports, like the SELF program. *See* AR 2954-55 (cited at DSOF ¶ 73(f)); 8/29/14 Hearing Tr. at 95.

Third, Teichmiller's assessment of Jacob's behavioral struggles was echoed by other school staff. Mishel Rych, the school social worker, reported that Jacob was not meeting behavioral goals from the March 2014 Behavioral Implementation Plan. DSOF ¶ 72(d). Jacob failed, for example, to decrease the number of instances of physical aggression at quarterly benchmarks over the next year. The goal was: By May 2014, Jacob will "decrease instances of physical aggression" with "no more than 2 prompts." AR 2917. Yet Jacob continued to exhibit acts of physical aggression. 8/29/14 Hearing Tr. at 315-16 (cited at DSOF ¶ 72(d)). Other behavioral goals focused on reducing non-compliant behavior, yet those too were not met. 8/29/14 Hearing Tr. at 316-17 (cited at DSOF ¶ 72(d)). The number of

instances of non-compliance had, in fact, increased from an average of eight to nine per day. 8/29/14 Hearing Tr. at 317 (cited at DSOF ¶ 72(d)); *see also* AR 2913.

Likewise, the school psychologist, Lisa Reh, testified that although Jacob showed some behavioral progress during his kindergarten school year, including a reduction in "minor physical outbursts," 8/29/14 Hearing Tr. at 171, major issues remained. DSOF ¶ 72(e). Jacob, despite the supportive measures taken by the School District, remained unable to identify his feelings, use appropriate coping mechanisms and take responsibility for his actions. 8/29/14 Hearing Tr. at 170-73 (cited at DSOF ¶ 72(e)).

Fourth, the SELF program supervisor Judy Boyans recommended that Jacob be placed in the SELF program. DSOF ¶ 73. Boyans based her recommendation upon her own classroom observation of Jacob and her review of the June 2014 IEP. DSOF ¶ 73 (citing 9/3/14 Hearing Tr. at 233-34). The SELF program offered the emotional regulation that, as Boyans observed from the June 2014 IEP, Jacob needed. DSOF ¶¶ 73, 73(b). Boyans also explained that the program was academically appropriate. Of the three then-first and second graders participating in the SELF program, two were performing at grade level for reading and math and the third was "just a little below." 9/3/14 Hearing Tr. at 227 (citing at DSOF ¶ 73(c)).

Against such testimony supporting the appropriateness of Jacob's placement in the SELF program, there was, as the hearing officer found, AR 0048-49, insufficient contrary evidence submitted by Plaintiffs. At the Due Process Hearing,

44

Plaintiffs cited their private psychologist Dr. Dodzik as evidence, but, again as this Court and the hearing officer have both found, AR 0049, Dr. Dodzik failed to offer a contrary opinion on Jacob's placement in the SELF program. That is not enough for Plaintiffs to meet their burden of proof that the SELF placement in the June 2014 IEP was unreasonable.

In these regards, this case is analogous to *Heather S.*, 125 F.3d at 1055-58, where the Seventh Circuit found that the school district provided the child with a FAPE under similar circumstances. The child in that case, like Jacob in this case, had Attention Deficit Hyperactivity Disorder, learning disabilities and problems engaging with peers. *Id.* at 1047-49. The school district placed the child in a special education classroom with a smaller class size and more adult supervision. *Id.* at 1056. The parents challenged that placement, but the Seventh Circuit disagreed.

As this Court and the hearing officer have done here, the Seventh Circuit in *Heather S.* reviewed the entire record and found the school district's evidence more compelling, including testimony from the director of special education who supported the placement and had extensive experience with the child. *Id.* at 1056-57. In contrast, the Seventh Circuit rejected conflicting testimony from two school psychologists, whose testimony the parents claimed supported a different placement. *Id.* In the end, the Seventh Circuit found the school district's evidence more credible, because it was "supported at the hearing by a number of psychologists and experts in special education." *Id.* at 1057. Indeed, the Seventh

Circuit remarked that one of the opposing psychologists offered by the parents (similar to Dr. Dodzik's absence from the administrative hearing here) may have internally struggled with the placement, but never memorialized his objection at the IEP meeting. *Id.* at 1057.

### 2. Least Restrictive Environment

In order to satisfy the least restrictive environment requirement, in selecting the appropriate placement along the continuum of alternatives, a school district must mainstream a student, that is, provide him an education with his nondisabled peers to the "greatest extent appropriate." *Beth B.*, 282 F.3d at 498-99 (citing 20 U.S.C. § 1412(5) and 34 C.F.R. § 300.551). To determine whether keeping a child in a regular school is "appropriate," the Seventh Circuit has directed this Court to ask whether the education in the conventional school was satisfactory and, if not, whether reasonable measures would have made it so. *Ross*, 486 F.3d at 273. A child may not be removed from the regular classroom unless his education there, with the use of supplementary aids and services, cannot be achieved satisfactorily. *Beth B.*, 282 F.3d at 498. Thus, if a child's education at a regular public school is satisfactory, the school district would violate the IDEA, and the Congressional mandate to mainstream, by removing him. *Id.* at 499. That is not this case.

Here, at the relevant time, the SELF program proposal was the least restrictive appropriate placement for Jacob because, as shown in the preceding section, Jacob was not receiving a satisfactory education within the regular classroom setting. In particular, Teichmiller, whose testimony this Court has

credited, found that no further adjustments in a general education setting could address Jacob's behavioral needs and thus recommended the structured SELF program. 8/29/14 Hearing Tr. at 95, 97. Independent experts and school staff, including the SELF program supervisor, echoed these comments. DSOF ¶¶ 72(d), 72(e), 73; 8/29/14 Hearing Tr. at 170-73, 315-17. At the time, the School District knew of no further adjustments that could have been made in the regular classroom setting to keep Jacob there, and Plaintiffs have not identified any such adjustments on review.

Although structured, the SELF program does not wall-off Jacob entirely from his nondisabled peers. Children in the program can interact with their nondisabled peers in multiple arenas, including in: (1) special area subjects (*e.g.*, art, music and gym); (2) lunch and recess; and (3) academic classes, based upon Jacob's emotional ability to handle those classes. AR 0049; 9/3/14 Hearing Tr. at 234-35. The program's administrator, Boyans, gave examples of students in the SELF program who spent more than half of their school day in general education classes. 9/3/14 Hearing Tr. at 214, 220-21. Some students were almost reincorporated fully into general education. 9/3/14 Hearing Tr. at 220-21. By creating multiple avenues for mainstreaming, the SELF program is the kind of special education program that courts in this Circuit have found appropriate when the children there, as Jacob here, suffered from significant and intractable behavioral issues. *E.g.*, *Beth B.*, 282 F.3d at 498-99; *Michael R.*, 2005 WL 2008919, at *19-20.

Plaintiffs argue that the SELF program placement does not maximize mainstreaming because when there is bad weather, Jacob would be required to stay in a self-contained room in the SELF program building and thus have no access to his nondisabled peers in a separate building. Boyans, the SELF program instructor, however, testified that when the weather is bad, instead of the children walking to the general education classroom building, the School District, as it had done in the past, would call a van to transport the children the one-tenth of a mile distance between the two buildings. DSOF ¶ 73(e); 9/3/14 Hearing Tr. at 217; Response to DSOF ¶ 73. Thus, no mainstreaming opportunities are usually lost in bad weather. Even if there were occasional days when bad weather prevented Jacob from interacting with his nondisabled peers in the other school building, that fact does not by itself deny that placement in the SELF program mainstreamed Jacob to the "maximum extent appropriate" given the extensive evidence in the record that Jacob's placement in regular public school, even with supports, was no longer benefiting him.

For these reasons, the School District has met the IDEA's substantive requirements of providing Jacob with a FAPE in the least restrictive environment. The issue here is whether deciding to place Jacob in the SELF program was an appropriate, not necessarily the best, placement at the relevant time, and it was. *Heather S.*, 125 F.3d at 1057.

## C.     Reimbursement

In their last category of arguments, Plaintiffs seek reimbursement for several types of expenses they incurred from 2011 to 2013.  Those are: (1) the cost of private evaluations of Jacob by Dr. Carbone and Dr. Ferre; (2) the costs of BDI Playhouse invoices; (3) the tuition Plaintiffs paid to Kid Country for the 2011 to 2012 school year; and (4) the expenses Plaintiffs incurred driving Jacob between Kid Country and Wilson Creek for weekly speech therapy instruction also during the 2011 to 2012 school year.  This Court addresses each reimbursement claim in turn (Subsections 1 to 4), and then the statute of limitations issue briefed by the parties (Subsection 5).

### 1.     Private Evaluations

Plaintiffs seek full reimbursement for private evaluations of Jacob by Dr. Carbone and Dr. Ferre in summer 2012.  As to Dr. Carbone and Dr. Ferre, the hearing officer awarded Plaintiffs $773.90, concluding that the School District had relied upon those evaluations in formulating the August 2012 IEP.  AR 0034-35.  $773.90 is Plaintiffs' post-insurance, out-of-pocket costs for the evaluations.  DSOF ¶ 30.  The full cost of the evaluations was $3,900.00, with insurance covering $3,126.10.  AR 3652, 3654; DSOF ¶ 30.  Plaintiffs argue that they should have received the total, pre-insurance cost of the evaluations, here, another $3,126.10.

The hearing officer did not expressly supply a statutory basis for her award (nor have the parties identified one beyond the IDEA itself generally).  *See* AR 0034-35.  However, it appears that the hearing officer was acting in accordance with the

Illinois State Board of Education's guidance that if the School District "chooses to use the private evaluation in lieu of conducting its own evaluation" then the District "must then pay for the parent's private evaluation." Illinois State Board of Education, "Special Education Unit Review Checklist" (*available at* http://www.isbe.net/spec-ed/pdfs/checklist_policies_procedures.pdf) (last visited March 29, 2016) (citing 34 C.F.R. § 300.502; 105 ILCS 5/14-8.02(b); and 23 Ill. Admin. Code § 226.180).

Here, the parties dispute whether the School District must pay the pre-insurance or post-insurance costs for the evaluations. In the absence of specific statutory guidance and consistent with the regulatory prohibition cited by Plaintiffs, 34 C.F.R. § 300.154(e) (school district cannot access parents' "private insurance" without their consent and with "regard to services required to provide FAPE to an eligible child"), this Court ultimately resolves this dispute, based upon important equitable considerations that support application of the collateral source rule to special education reimbursement claims under the IDEA. AR 0035. This Court can, as both parties recognize, consider equitable factors when fashioning relief under the IDEA. 20 U.S.C. § 1415(i)(2)(C)(iii); *see also Edwin K.*, 2002 WL 1433722, at *18 (recognizing this Court's equitable powers to fashion a proper remedy under Section 1415).

Defendants principally rely on *Mary P. v. Illinois State Board of Education*, 934 F. Supp. 989, 991-92 (N.D. Ill. 1996), also a case brought under the IDEA and where the District Court, based upon its equitable powers, awarded post-insurance,

out-of-pocket expenses for the child's speech therapy classes. Yet the Court in *Mary P.* did not explain or otherwise analyze the basis for awarding only out-of-pocket expenses at any length.

More compelling is Restatement (Second) of Torts § 920A, which is persuasive evidence that this Court, in the exercise of its equitable powers, should award the total, pre-insurance cost of the evaluations in the special education context because that is the guiding principle in the related tort law context. Section 920A(2) states the general tort law principle that payments made to "the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." Comments (b) and (c)(1) to Section 920A continue that, as here, the tortfeasor should not receive a "windfall" because the injured party procured insurance. Thus, the tortfeasor is required to compensate the injured party for "all harm that he causes." Restatement (2d) of Torts § 920A cmt.

This *de facto* moral hazard problem (that is, the tortfeasor does not bear the full cost of his actions when insurance offsets damages) flows into the special education context with equal force, as this case demonstrates. *See* Richard A. Posner, *Economic Analysis of Law* § 6.13 (9th ed. 2014) (providing the economic case for the collateral source rule). Here, the School District, like a tortfeasor pocketing a windfall, has dipped into Plaintiffs' insurance, thereby appropriating the benefits of the premiums the parents paid and transforming their insurance into a school subsidy, and has thereby avoided the cost of conducting evaluations or providing

services that the District otherwise had a legal duty to procure itself in the first instance. *See, e.g.*, 34 C.F.R. § 300.502. Equity thus requires that this result not be sanctioned. Indeed, had insurance covered Jacob's evaluations in full, the School District would have paid nothing absent application of the collateral source rule.

Limiting parent recovery to the post-insurance, out-of-pocket costs for private evaluations, as the hearing officer decided without much analysis, also presents further equitable dangers. As just one example, as parents access their insurance more often to cover private evaluations or services (an outcome favored by school districts only on the hook for a fraction of the bill), insurers may respond by limiting the scope of coverage or raising the cost of premiums to parents. Likewise, parents, in ostensibly conducting evaluations on the school district's behalf, may also reach insurance policy limits on the number of covered evaluations or therapy sessions, and thus, the improper subsidy of the school district will deprive the parents of their ability to use their full private resources to procure the additional care their children actually need, and do so beyond the legal minimums required by the FAPE mandate. In the absence of full recovery, the end result is that parents and children would suffer real and unjustified harms, and school districts would unfairly profit by outsourcing their own statutory obligations. The law can, and should, do better.

For these reasons, this Court, in the exercise of its equitable powers, awards Plaintiffs another $3,126.10 for the private evaluations of Jacob by Dr. Carbone and Dr. Ferre in summer 2012. Coupled with the $773.90 the hearing officer already awarded, Plaintiffs are now whole, and Defendants cannot pocket any windfall.

### 2.    BDI Playhouse

Plaintiffs next seek reimbursement for BDI Playhouse invoices totaling $1,559.00.  AR 3651; PSOF ¶ 15.  This cost was for 14 occupational therapy sessions during 2011 to 2013.  PSOF ¶ 15.  The hearing officer denied any reimbursement for two reasons:  Plaintiffs had not met their burden to show that Defendants failed to pay this invoice, and, separately, they failed to show the amount due.  AR 0035.  In responding to the School District's statement of facts, Plaintiffs admit they "did not offer evidence—either through testimony or proof of payment to BDI—of expenses they allegedly incurred related to the evaluation or services."  Response to DSOF ¶ 23.  Plaintiffs contradict that prior admission in their motion papers, pointing to a summary document from BDI Playhouse in the Administrative Record that shows the dates and amounts of the payments Plaintiffs allegedly tendered.  *See* AR 3651.

This Court need not consider whether Plaintiffs satisfied their burden of proof by burying a summary invoice in an Administrative Record surpassing 4,500 pages, because Plaintiffs still have failed to show that Defendants did not pay the BDI Playhouse invoice.  That was an independent—and still unrefuted—basis for the hearing officer's decision.  *See* AR 0022.

### 3.    Placement at Kid Country

Plaintiffs next seek $4,290.00 in reimbursement for the tuition they paid to Kid Country for the 2011 to 2012 school year based on the October 2011 IEP.  This reimbursement claim fails on the merits.

Plaintiffs' right to reimbursement turns on whether Defendants placed Jacob at Kid Country as part of the October 2011 IEP. If so, the School District, according to the hearing officer, AR 0036, must reimburse Plaintiffs for the Kid Country tuition. If not, then Plaintiffs' instant reimbursement claim fails.

The October 2011 IEP, in relevant part, contains a "Current School Year" section with fields for Jacob's "General Education Environment" and "Special Education Environment." AR 2600. The General Education Environment field reports that Jacob was attending Kid Country for 2,700 minutes per week. AR 2600. The October 27, 2011 IEP also contains a "Next School Year" section with the same fields. *Compare* AR 2600, *with* AR 2601. The General Education Environment field reports that Jacob will be attending Wilson Creek and Kid Country for 750 and 1,200 minutes per week, respectively. AR 2601. Elsewhere in the October 27, 2011 IEP are fields for the School District's and Plaintiffs' eligibility and educational placement decisions. AR 2591-92, 2602.

Based upon the evidence presented, the hearing officer concluded that the School District did not place Jacob at Kid Country merely by reporting Jacob's attendance at that preschool in the October 2011 IEP. AR 0035-36. This Court agrees. Without more, and there is nothing more here, descriptive information about a child's school placement in the "General Education Environment" and "Next School Year" sections does not constitute a placement or intention by the School District to send the child there. Instead, Jacob's placements are recorded in the dedicated educational placement field. *See* AR 2591-92, 2602. The dedicated

educational placement field only shows that the team placed Jacob in speech therapy instruction.  AR 2602.  Thus the October 2011 IEP shows that the School District did not place Jacob in the private school Kid Country.

This Court need not go any further because the face of the October 2011 IEP is clear that there was no private school placement at that time.  Yet, for completeness, this Court also addresses the external evidence presented by both parties.  Although this Court does not consider extrinsic evidence under usual circumstances, it retains the power to do so when, for example, the IEP may present questions "within" its four corners.  *John M.*, 502 F.3d at 715-16.

Here, the hearing officer found credible the testimony from school employees explaining that the School District documented Jacob's school attendance for data collection purposes, and not for placement purposes.  AR 0035.  In particular, Robin Latman, who supervises the special education process for Manhattan School District No. 114, explained that in 2010, the Illinois School Board of Education began requiring schools to report early childhood placement information; and, in order to supply that information, the School District began documenting a child's private preschool attendance (among other information) in IEP forms, including how many minutes per week the child spent at the preschool.  DSOF ¶ 19 (citing 9/3/14 Hearing Tr. at 49-65, 140-42).

Beyond the evidence explaining the School District's reporting requirement, the hearing officer also emphasized the absence of any credible testimony or evidence that Plaintiffs understood the School District to be reimbursing them for

the Kid Country tuition, indeed, Jacob's placement at the preschool may actually have occurred before October 27, 2011, the date of the IEP meeting. AR 0035-36. Additionally, the evidence before the hearing officer failed to show that Plaintiffs had any substantive discussion with the School District about the costs of Jacob's placement at Kid Country. AR 0036.

For their part, Plaintiffs assert, as their own external evidence, the argument that this Court should simply infer from the omission of Kid Country from the August 2012 IEP that Defendants' inclusion of Kid Country in the October 2011 IEP was, in fact, a placement decision. [69] at 13-14 (citing AR 2679). Principal Hogan testified that the School District and Plaintiffs met on August 2, 2012, at which time the School District denied Plaintiffs' request for reimbursement of Kid Country tuition expenses. [69] at 13 (citing 8/26/14 Hearing Tr. at 250); *see also* DSOF ¶ 33. Based upon this discussion, Plaintiffs somehow infer that Defendants omitted Kid Country from the August 2012 IEP, because they were not reimbursing those costs, so, conversely, Defendants must have intended to reimburse Plaintiffs for the Kid Country tuition because the preschool was listed in the October 2011 IEP.

In light of the evidence specific to the October 2011 IEP, Plaintiffs' evidentiary inferences from the August 2012 IEP—which was 10 months later—are too weak to justify this Court reversing the hearing officer, and indeed, this Court disagrees with Plaintiffs' suggested inferences. The Administrative Record shows that Plaintiffs (through their advocate) made a specific request to have the School District place Jacob at Kid Country and pay his tuition there. DSOF ¶ 33. The

School District specifically denied that request. DSOF ¶ 33. Based upon these facts, the more reasonable inference is that Kid Country was not included on the August 2012 IEP, because Jacob was not going to attend Kid Country during the 2012 to 2013 school year.

For these reasons, this Court denies reimbursement of the tuition Plaintiffs paid to have Jacob attend Kid Country for the 2011 to 2012 school year.

### 4. Transportation

Plaintiffs last seek $232.76 in reimbursement for transporting Jacob between Kid Country and Wilson Creek, where Jacob received weekly speech therapy instruction, from November 4, 2011 to May 4, 2012. Jacob's father drove Jacob between the two locations but was not reimbursed for his fuel expenses by Defendants. PSOF ¶ 10. This is consistent with the then-effective October 2011 IEP, which, in the field for "Transportation," had the option "Student does not require transportation" checked. AR 2603 (cited at PSOF ¶ 9).

Despite this clear language, Plaintiffs rely on 34 C.F.R. § 300.139(b) to argue that the School District had a statutory duty to pay for their transportation costs. Section 300.139(b) provides that the school will pay for transportation if "necessary for the child to benefit from or participate in … services" provided at private schools. The School District's duty to pay for transportation is not absolute by the very language of Section 300.139(b)—reimbursement must be "*necessary* for the child to benefit from … services." 34 C.F.R. § 300.139(b) (emphasis added). Based upon the administrative record below, the hearing officer found that this

requirement was not met: Plaintiffs had failed to present "any credible evidence or testimony of the need for reimbursement or that they made the School District aware of the alleged need prior to May 2012." AR 0037. Plaintiffs still have not shown that reimbursement was "necessary." All of this coupled with the small amount at stake, $232.76, confirms that reimbursement was not necessary for Jacob to receive speech therapy instruction.

### 5. Statute of Limitations Issue

As noted above, several of Plaintiffs' claims for reimbursement fail on the merits. Having reaching this holding, this Court need not consider whether, as the School District argues, the two-year statute of limitations applicable in IDEA cases (20 U.S.C. § 1415(f)(3)(C)) also bars recovery for some of Plaintiffs' reimbursements claims here, because the relevant expenses actually awarded here (the pre-insurance costs of the Dr. Carbone and Dr. Ferre evaluations) occurred no earlier than May 2012, and thus fall within the two-year limitations period.

Nevertheless, even if this Court were to find for Plaintiffs on their unsuccessful reimbursement claims, and thus need to address the limitations issue directly, the ultimate result would remain the same. In this case, the Notice of Procedural Safeguards was, in fact, substantively deficient (and thus might have extended the relevant time limitation under *Jenna R.P. v. City of Chicago School District No. 229*, 3 N.E.3d 927, 943-44 (Ill. App. Ct. 2013)), but Plaintiffs failed to properly raise this issue in the proceedings below. Joint Supplemental Memorandum Regarding the Statute of Limitations Pursuant to the Court's

February 9, 2016 Order [112]. Accordingly, Plaintiffs lack any basis now to extend the limitations period on review, and thus, their untimely claims remain barred. *John M. v. Board of Education of Evanston Township High School District 202*, No. 05-6720, 2009 WL 691276, at *4 (N.D. Ill. March 16, 2009) (an argument must be raised in the administrative hearing to be preserved for judicial review); *James D. v. Board of Education of Aptakisic-Tripp School District*, No. 07-7018, Order at p. 4 (N.D. Ill. Aug. 12, 2008) (Dkt. 36) (same); *Reed v. Lincoln-Way Community High School District No. 210*, No. 98-4934, 2000 WL 696793, at *5 (N.D. Ill. May 30, 2000) (same).

## IV. Conclusion

Defendants' motion for summary judgment [55] and Plaintiffs' cross-motion for summary judgment [51] are both granted in part and denied in part. Plaintiffs are awarded $3,126.10 for the private evaluations of Jacob by Dr. Carbone and Dr. Ferre in summer 2012, but, in all other respects, the September 22, 2014 decision by the hearing officer stands. In light of this ruling, Defendants' motion to strike [74], motion for reconsideration [92], and motion to supplement the record [101], are all denied as moot (and, in any event, the most recent supplemental materials filed by Plaintiffs were reviewed but found to be immaterial to this Court's ultimate decision). Last, for the purposes of docket clarity, this Court grants Plaintiffs' pending motion to file an oversized brief [50] and denies Plaintiffs' initial motion for summary judgment [48] as moot, because it was superseded by the amended motion

[51] which is at issue here.  All other pending motions, not otherwise disposed of herein, are denied as moot.  Civil case terminated.

Dated: March 29, 2016

                            Entered:

                            _____
                            John Robert Blakey
                            United States District Judge